**United States District Court**
**District of Massachusetts**

_____
                                )
DONALD BOHN,                     )
        **Plaintiff,**           )
                                )
        v.                       )    **Civil Case No.**
                                )    **10-30078-NMG**
VERMONT MUTUAL INSURANCE, CO.,   )
        **Defendant.**           )
_____ )


**MEMORANDUM OF DECISION**

**GORTON, J.**

This action involves claims under M.G.L.c. 93A and 176D.
Plaintiff Donald Bohn ("Bohn") alleges that defendant Vermont
Mutual Insurance Company ("Vermont Mutual") violated M.G.L.c.
176D when it failed to settle plaintiff's claim after liability
became reasonably clear.

The Court presided over a three-day bench trial in early
January, 2013.  The Court now publishes its findings of fact and
conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**I.   Findings of Fact**

  **A.   Parties and their Employees**

  1.  Plaintiff is a resident of the State of Connecticut.

  2.  Defendant Vermont Mutual is a corporation duly organized
under the laws of the State of Vermont and has a principal place
of business in Montpelier, Vermont.

  3.  At all relevant times, Drucilla Gillespie ("Gillespie")

-1-

was a Claims Specialist for Vermont Mutual.  Gillespie worked out of her home located in Haverhill, Massachusetts, where she has a computer and telephone line provided to her by Vermont Mutual for her business use.

4.  At all relevant times, Bruce Kelly ("Kelly") was the Casualty Program Manager for Vermont Mutual and served as Gillespie's supervisor.  He also has a law degree and is admitted to practice law in Vermont and New York.

5.  At all relevant times, John and Donna Giardina were married, resided in Pittsfield, Massachusetts and owned a building which they rented to residential and commercial tenants on Railroad Street in Great Barrington, Massachusetts ("the Railroad Street Property").

6.  At all relevant times, Vermont Mutual insured Mr. and Mrs. Giardina through a policy on the Railroad Street Property that afforded coverage for claims of bodily injury in the amount of $500,000 and for medical payments in the amount of $5,000.

**B.   Plaintiff's Injury on January 11, 2006**

7.  On January 11, 2006, Bohn and his friend, Ausra Ragauskaite ("Ragauskaite"), traveled from Lakefield, Connecticut to Great Barrington, Massachusetts to watch a movie.  At approximately 7:00 P.M., Ragauskaite's car became stuck due to icy conditions while attempting to park in a lot next to the Railroad Street Property that was also owned by the Giardinas.

8.   Bohn suffered a tri-malleolar fracture to his left ankle after he got out of the vehicle to see if he could help push it free and fell on the snow and ice.

**C.   Defendant's Investigation of Plaintiff's Claim**

9.   Defendant first learned of plaintiff's injury by letter dated February 14, 2006 from plaintiff's counsel, Attorney John Weingold.

10.   On that same day, Gillespie retained the services of Paul Rench, an independent claims adjuster based in Dalton, Massachusetts, and instructed him to conduct a "full investigation" of the accident.  At that time, Rench had investigated personal injury and property damage claims for 38 years and had investigated claims on behalf of Vermont Mutual in Berkshire County, Massachusetts since 1985.

11.   Rench first spoke with Attorney Weingold on February 16, 2006.  At that time, Attorney Weingold had not yet met with Bohn.

12.   Although he did not know the exact location where Bohn suffered his injury, Attorney Weingold told Rench that: a) Bohn had slipped and fallen in a "parking lot" next to the Railroad Street Property, b) the ice was thick and had ruts left by tire tracks, and c) photographs of the scene were taken the following day.

13.   Regarding Bohn's injury, Weingold stated that: a) Bohn

sustained a lower leg fracture as a result of the fall, b) he had been treated at the Sharon Hospital in Sharon, Connecticut before being transferred to Westchester Hospital in Westchester, New York for his first surgery, and c) he would need a second surgery.

14.   At that time, Attorney Weingold incorrectly identified the date of the injury as January 12, 2006 and incorrectly identified Bohn's friend as "Ursula," rather than "Ausra," and did not provide her last name.

15.   Rench requested that Weingold provide him with copies of the photographs, medical records and permission to interview Bohn.

16.   Also on February 16, 2006, Rench learned from Mr. Giardina that the Town owned the adjacent parking lot.

17.   By letter dated March 24, 2006, Rench notified Vermont Mutual that: a) plaintiff had suffered a tri-malleolar fracture, b) plaintiff was 61 years old at the time of the fall and retired, c) despite making a second request for them, Rench had not yet received photographs of the accident scene, but d) he had obtained a drawing of the parking lots from the Town of Great Barrington and weather records for the area and had requested reports from the police and fire departments for January 11, 2006.

18.   On April 11, 2006 Rench met with Mr. Giardina and took

photographs of the Giardinas' lot.  Rench learned that: a) the Giardinas only owned part of the lot next to the Railroad Street Property, b) the Giardinas' tenants and the public were not prohibited from parking there, c) there were no signs prohibiting parking, and d) the lot was not plowed or sanded during winter months.  Rench provided a summary of this information to Gillespie by letter dated April 26, 2006.

19.  By letter dated May 2, 2006 Attorney Weingold sent Rench copies of photographs that he "believe[d]" Ragauskaite took the day after the accident, including one that supposedly showed the location where Bohn fell but that he would "confirm that fact."  He claimed that the lot looked "more like a skating rink."

20.  Also by that letter, Attorney Weingold first inquired about the policy limits on the Giardina's insurance policy. Shortly thereafter, Rench informed him that those limits were $500,000 for liability and $5,000 for medical payments.

21.  Attorney Weingold also stated that "Ms. Rataufaaite" [sic] lived in Lakeville, Connecticut and could identify the location of the accident but he did not provide her address or telephone number.

22.  Rench forwarded all of the reported information to Gillespie by letter dated May 4, 2006.  He also noted that: a) Attorney Weingold did not typically permit insurers to take

statements from his clients, although he would "consider" that
request, and b) after failing to obtain her phone number, Rench
attempted to contact an "Ausra Rataufaaite" by sending a letter
addressed to her in Lakeville, Connecticut on May 4, 2006.

23.  Ragauskaite received Rench's letter and contacted him.
Rench took her statement on June 6, 2006, in which Ragauskaite
said that: a) the lot was extremely icy and untreated, b) her
vehicle became stuck while she attempted to drive out of the lot,
c) Bohn attempted to push the car from the rear, then walked
around to the driver's side of the car to make a second attempt,
d) she did not see him fall but discovered him on the ground
after opening her door, and e) she returned to photograph the
accident scene on the following day, noting that the area was
"bumpy and uneven."

24.  On June 30, 2006, Kelly, who had been monitoring the
progress of the claim since sometime in March, 2006, noted in the
company's "claim log" that he was "not liking the way this one is
shaping up".  Kelly expressed his concerns that: a) Vermont
Mutual needed to determine whether plaintiff had fallen on the
insured's property, b) it was questionable whether the Giardinas
could establish that the icy condition resulted from a "natural"
accumulation of snow and ice, and c) Bohn had a serious injury.

25.  By letter dated June 18, 2006 Rench provided medical
bills in the amount of $58,000 and projected that the total

-6-

medical bills would exceed $100,000.

26.  On August 9, 2006, Gillespie agreed with Kelly's concerns expressed in the "claim log" and added that a) Ragauskaite will place the fall on the Giardinas' property and b) that fact was "[p]roblematic for us" because Mr. Giardina admitted he did not maintain the parking lot.

27.  On August 14, 2006, Gillespie received information from Dr. Fred Ward, defendant's weather expert, pertaining to conditions near Great Barrington, Massachusetts from January 10 through 12, 2006.  According to Ward, there was 2"-4" of snow on the ground at that time.  On January 11, however, temperatures rose above 40 degrees in the afternoon and it rained at around midnight on January 12 before it later dropped below freezing.

28.  Also on August 14, 2006, Rench took a recorded statement from Bohn.  With respect to his fall, Bohn stated that: a) Ragauskaite had driven to the Giardinas' lot upon finding the adjacent municipal lot full, b) the Giardinas' lot was covered by thick ice, prompting Ragauskaite to attempt to drive out of the lot, c) when her car became stuck, Bohn got out of the vehicle to try and push it free, d) he slipped and fell on the ice while preparing to push on the driver's side door handle, e) after the fall, he remarked that his pants were wet, and f) a passerby helped him back into Ragauskaite's car.

29.  With respect to his injuries, Bohn stated that: a)

-7-

Ragauskaite drove him to Sharon Hospital from which he was transported to Westchester Hospital, b) he was hospitalized at Westchester for 10 days prior to undergoing his first surgery, c) he began physical therapy at Sharon Hospital in July, 2006, and d) the medical bill from Westchester Hospital prior to surgery was $45,000.

30.  By letter dated August 29, 2006 Rench provided Gillespie with a summary of Bohn's statement and forwarded a subrogation demand upon Vermont Mutual from the Chubb Group ("Chubb"), which insured Ragauskaite's vehicle and had paid $10,000 in personal injury protection ("PIP") benefits to Bohn. He also noted that Bohn did not have health insurance to cover his medical bills.

31.  By letter dated September 15, 2006 Rench forwarded additional medical bills to Gillespie but noted that, while plaintiff alleged $108,392 in medical expenses, Rench had received bills totaling only $59,743.

### D.    Plaintiff's 93A Demand and Defendant's Response

32.  By letter to Rench from Weingold dated September 19, 2006, Weingold demanded $500,000 to settle Bohn's claim against Vermont Mutual's insured, the Giardinas.  He further declared that "liability has become reasonably clear" and that, pursuant to M.G.L. c.176D, Vermont Mutual had 30 days to respond or it would be in violation of Chapter 93A.

33.   Rench forwarded a copy of that letter to Gillespie on September 22, 2006, and noted that, although Weingold's letter referenced $108,742 in medical bills, he had only received bills totaling approximately $50,000.

34.   On September 20, 2006 Gillespie completed a memorandum in anticipation of Vermont Mutual's first "roundtable" meeting regarding Bohn's claim, in which several employees were scheduled to discuss claimed liability and damages.

35.   On October 3, 2006 Vermont Mutual held its "roundtable."  The participants were "somewhat split" on whether the accumulation of snow and ice where Bohn fell was "natural" or "unnatural."  They also identified Ragauskaite as a possible cause of Bohn's injury because she knowingly drove onto the icy lot.  They concluded that Vermont Mutual's liability on the claim was "questionable" and determined to seek legal advice from outside counsel regarding several issues, including whether there was an "unnatural" accumulation of snow and ice, whether Bohn trespassed by parking on the lot, the extent of Bohn's contributory negligence and the viability of seeking contribution from Ragauskaite.

36.   As a result of the "roundtable," Vermont Mutual increased its reserve on Bohn's claim from $1,000, initially allotted in February, 2006, to $50,000.  Vermont Mutual also retained Attorney Philip Callan to provide a legal analysis of

-9-

several issues identified at the "roundtable."

37.  By letter dated October 5, 2006, Rench forwarded additional medical bills to Vermont Mutual so that they then totaled $107,965.  He also noted that Westchester Hospital had approved Bohn for a discount under its Charity Care Program, effectively waiving $45,000 of his medical bills.  Vermont Mutual received those records on October 10, 2006.

38.  Prior to becoming aware of those additional records, Gillespie advised Attorney Weingold, by letter dated October 10, 2006, that Vermont Mutual was denying liability on the claim. She stated that a) liability was not yet "reasonably clear" and b) (incorrectly) Vermont Mutual had not yet received all the medical bills identified by Weingold.

39.  By letter dated October 16, 2006, Attorney Weingold advised Gillespie that he had previously sent the medical bills to Rench and inquired as to what information Vermont Mutual possessed to show that liability was not "reasonably clear."

40.  Attorney Callan provided his legal advice to Gillespie in an "Initial Report," dated October 18, 2006.  He stated that: a) the case law on "unnatural" accumulations of snow and ice under the circumstances was split and further investigation was needed but the issue likely presented a jury question, b) Bohn's own negligence likely contributed to 25-35% of his injuries, and c) Ragauskaite may be liable for a contribution as a joint

tortfeasor.

41.  By letter dated October 19, 2006, Gillespie advised Attorney Weingold that Vermont Mutual had received medical bills previously thought missing and acknowledged that the subject correspondence had probably crossed in the mail.  She also denied liability on Bohn's claim and cited a number of reasons why liability was not yet reasonably clear, including: a) that the icy conditions may have resulted from a "natural" accumulation, b) Ragauskaite's negligent operation of her vehicle, and c) Bohn's contributory negligence in attempting to free the vehicle.

42.  In spite of the pending issues, Vermont Mutual extended an offer of settlement in the amount of $25,000, plus payment of $5,000 in medical payments coverage available under the Giardinas' policy.

43.  Bohn did not respond to Vermont Mutual's offer of settlement or otherwise seek to negotiate a resolution of his claim in 2006.

### E.  Plaintiff's Tort Case and Defendant's Offer of Judgment

44.  On January 13, 2007, Bohn filed suit against the Giardinas and Ragauskaite in the Massachusetts Superior Court for Berkshire County ("the Tort Case").  In addition to alleging that the Giardinas negligently maintained their property and failed to warn him of a dangerous condition, Bohn also alleged that Ragauskaite had negligently operated her vehicle.

45.   By letter dated September 17, 2007, Attorney Callan summarized his deposition of Bohn and made the following observations, among others: a) Bohn's claim for lost earnings, in the amount of $700 - 1,500 per week between January 2006 and May 2007, was weak because he had retired in 2004; b) Bohn required crutches to walk until about mid-fall, 2006; c) he suffered nagging pain in his left ankle until metal plates supporting it were removed in November, 2006; and d) of the $170,000 in medical expenses he had incurred, about $160,000 remained unpaid.

46.   On March 25, 2008, the Berkshire Superior Court denied Ragauskaite's motion for summary judgment, stating that the evidence "would permit a jury to find that [Ragauskaite] was at fault."

47.   Bohn, the Giardinas and Ragauskaite agreed to mediate their dispute on July 21, 2008.

48.   On June 27, 2008, Attorney Callan provided Gillespie with a "Pretrial Report" in which he analyzed various aspects of plaintiff's claims.  He noted that the following issues persisted for the jury to decide: a) whether an unnatural accumulation of snow existed, b) whether Bohn had trespassed on the Giardinas' lot and was therefore entitled to a lesser standard of care, c) Bohn's contributory negligence, and d) Ragauskaite's negligence.

49.   Attorney Callan estimated the likelihood of a) a defense verdict at 30-40%, and b) a finding of contributory

negligence against Bohn which would offset his claim for damages by 25%.

50.   He also estimated that if Bohn's claim was <u>fully</u> accepted by a jury, the likely verdict range would be $300,000 to $375,000, plus interest, although a "generous jury" could award $500,000.

51.   As to settlement, Attorney Callan estimated that it would take $150,000 to 200,000 to settle plaintiff's claim, with a contribution ratio among the insurers, Vermont Mutual to Chubb, at 2:1.

52.   Vermont Mutual conducted a second "roundtable" meeting on July 3, 2008.  As a result, defendant raised its reserves to $100,000 and authorized Gillespie to offer up to $75,000 in order to settle the claim at mediation.  Kelly later advised Gillespie to contact him if it appeared feasible to settle Bohn's claim for $100,000, at which time he would consider authorizing her to offer that amount.

53.   During mediation, Bohn settled his claim against Ragauskaite for $50,000 but did not settle his claim against the Giardinas.

54.   By letter dated July 25, 2008, Bohn demanded of the defendant settlement in the amount of $627,000 and asserted that Vermont Mutual was in violation of M.G.L.c. 176D by refusing to settle.

-13-

55.  By letter dated August 19, 2008 Gillespie acknowledged
Bohn's second demand and again denied liability.  In addition to
asserting that Bohn's fall may have been caused by a "natural"
accumulation of ice and snow and Bohn's own contributory
negligence, Gillespie raised the possibility that Bohn was a
trespasser and that not all of Bohn's unpaid medical bills,
particularly those that had been waived, would be admissible
evidence of his damages.  She nevertheless offered settlement in
the amount of $50,000, plus $5,000 in medical payment coverage.
Bohn declined that offer.

56.  On September 18, 2008, Callan made an offer of judgment
under Massachusetts Rule of Civil Procedure 61 in the amount of
$61,000.

57.  Bohn accepted the offer of judgment on September 26,
2008 but subsequently refused to sign a release of his claim
under M.G.L.c. 176D and a stipulation of dismissal.

58.  By letter dated October 15, 2008, Attorney Callan
notified Attorney Weingold that he had requested a draft from
Vermont Mutual in the amount of $61,000, to be held in escrow
pending Bohn's execution of the offer of judgment extended in
September and written notation that the judgment had been
"satisfied in full".

59.  On October 29, 2008, Attorney Callan endorsed a check
payable to Bohn and Attorney Weingold in the amount of $61,000 to

-14-

comply with the settlement offer of Vermont Mutual.

**F.   Prejudgment Interest**

60.   After Bohn received the $61,000 payment, Attorney Weingold continued to demand prejudgment interest on that amount.

61.   On December 30, 2008, the Berkshire Superior Court issued final judgment in the Tort Case based upon the September, 2008 settlement.

62.   In March, 2009, Attorney Callan filed a motion to compel the plaintiff to execute the final judgment in compliance with Vermont Mutual's offer of judgment.

63.   On May 12, 2009, after noting that the motion to compel placed the Court in "uncharted territory," the presiding Superior Court Judge denied Attorney Callan's motion and ordered Vermont Mutual to pay prejudgment interest on its $61,000 offer of judgment.

64.   On May 29, 2009, Vermont Mutual paid Bohn an additional $17,570 in interest and Attorney Weingold endorsed the offer of judgment as "satisfied in full."

**II.   <u>Conclusions of Law</u>**

**A.   Applicable Law**

1.   Unfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce, when conducted in the Commonwealth of Massachusetts, are unlawful under M.G.L.c. 93A, § 2.

2.  Unfair or deceptive acts or practices in the business of insurance are specifically enumerated in, and prohibited by, M.G.L.c. 176D, § 3.  Unfair claims settlement practices are enumerated and prohibited under M.G.L.c. 176D, § 3(9).

3.  Because M.G.L.c. 93A, § 2 incorporates M.G.L.c. 176D, § 3 by reference an insurer who violates the latter may be sued for violation of Chapter 93A.  Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 950 (Mass. 2001).

**B.   Whether Liability was "Reasonably Clear"**

4.  Under M.G.L.c. 176D § 3(9)(f), an insurer is under a duty to make a "prompt, fair and equitable" offer of settlement only after liability on a claim has become "reasonably clear," as to both fault and damages.  Clegg v. Butler, 676 N.E.2d 1134, 1138, 1140 (Mass. 1997).

5.  Liability is reasonably clear if a reasonable person, with knowledge of the relevant facts and law, would probably have concluded that the insurer was liable to the plaintiff.  Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir. 2002).

6.  Conversely, an insurer is not required to put a fair and reasonable offer on the table until liability and damages are apparent or if there exists a legitimate difference of opinion as to the extent of liability.  Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 659-60 (Mass. 2003) ("Bobick II").

7.  M.G.L.c. 176D does not penalize insurers who delay in

good faith when liability is not clear and requires further investigation. Clegg, 790 N.E.2d at 1140.

8. An insurer who takes a "plausible, reasoned legal position that may ultimately turn out to be mistaken" or unsuccessful is not liable under c. 93A and 176D. Guity v. Commerce Inc. Co., 631 N.E.2d 75, 77 (Mass. App. Ct. 1994).

9. As of the date of plaintiff's injury, a landowner owed no duty of reasonable care to protect lawful visitors to his property from "natural" accumulations of snow and ice because the Massachusetts Supreme Judicial Court had not yet abolished the distinction between "natural" and "unnatural" accumulations which it did in its decision in Papadopoulos v. Target Corp., 930 N.E.2d 142 (Mass. 2010).

10. As of the date of plaintiff's injury, a landowner's duty of care to a trespasser was merely to avoid gross negligence. Schofield v. Merrill, 435 N.E.2d 339 (Mass. 1984).

11. As of the date of plaintiff's injury and the time of defendant's first offer of settlement, whether an insurer could challenge the admission of medical expenses as proof of reasonable damages incurred on the basis that the reasonableness of those bills was in question, had not been resolved by the Massachusetts Supreme Judicial Court ("the SJC") as it did in Scott v. Garfield, 912 N.E.2d 1000 (Mass. 2009).

12. Even if fault on the part of the insured party has been

"ascertained," if the "percentage of damages attributable" to
that party is the "subject of good faith disagreement" then
liability is not reasonably clear. <u>Bobick II</u>, 790 N.E.2d at 659.

13.   As of the date of plaintiff's injury, a defendant who's
negligence contributed 1% or more to plaintiff's injury could be
held liable for 50% or more of plaintiff's damages.  <u>See, e.g.</u>
<u>Shantigar Foundation</u> v. <u>Bear Mountain Builders</u>, 804 N.E.2d 324,
332 (Mass. 2004) (citing M.G.L.c. 231B, § 1).

14.   As of the date of plaintiff's injury, a plaintiff's
recovery in negligence was to be diminished in proportion to the
negligence attributable to him.  If the plaintiff's negligence
exceeded that of the combined negligence of all defendants, i.e.
was 51% or greater, he could not recover on a negligence claim
against any defendant. <u>See</u> M.G.L.c. 231, § 85.

15.   The fact that defendant raised its reserve for
plaintiff's claim following both of its "roundtable" meetings, in
October, 2006 and June, 2008, suggests that the insurer
reasonably recognized that its liability had become more likely
but it does not mean that liability had become "reasonably clear"
as to both fault and damages. <u>See</u> <u>Broaddus</u> v. <u>Mass W. Ins. Co.</u>,
2004 WL 2746090, at *6 (Mass. Super. Nov. 18, 2004).

16.   Likewise, Attorney Callan's estimate in June, 2008 that
a plaintiff's verdict could exceed $300,000 suggested that
defendant had substantial exposure but not the likelihood of its

being held liable.

17.  Defendant's liability was not reasonably clear in October 2006, when defendant considered and responded to plaintiff's Chapter 93A demand for settlement in the amount of $500,000, because legitimate questions existed both as to fault and damages based upon the possibility that defendant could prove the snow and ice accumulation resulted from a "natural" accumulation and that Ragauskaite and Bohn both contributed to the cause of Bohn's injury through their own comparative negligence.

18.  Defendant's liability was not reasonably clear during the mediation in July, 2008 or immediately thereafter, because legitimate questions as to fault and damages persisted after the close of discovery in the Tort Case.  In addition to the issues identified in October 2006, jury questions existed as to whether plaintiff was a trespasser and whether all of plaintiff's medical bills constituted proof of his reasonable medical expenses.

19.  Defendant's liability became reasonably clear only after plaintiff accepted defendant's offer of judgment on September 26, 2008, at which point its liability and damages were apparent in the amount of $61,000.

20.  Defendant's liability for prejudgment interest with respect to that offer of judgment, however, was not reasonably clear when it tendered payment of $61,000 in October, 2008

because the judgment was silent in that regard and, under the circumstances, the claim for prejudgment interest was an issue of first impression that was reasonably disputable.

21.  Because liability was not reasonably clear prior to plaintiff's acceptance of the offer of judgment, defendant was under no prior duty to make offers in an amount greater than those it made. See Clegg, 676 N.E.2d at 1140 (no duty to settle until liability reasonably clear).

**C.   Conditioning Settlement upon Release of Claims**

22.  Once liability becomes "reasonably clear," an insurer may not fail to settle a claim promptly under one portion of its insurance policy in order to "influence settlements under other portions of the insurance policy coverage." See Scott v. Vermont Mut. Ins. Co., Civ. No. 07-12081-DPW, 2011 WL 4436984, at *12 (D. Mass. Sept. 22, 2011) (interpreting M.G.L.c. 176D, § 3(9)(m)).

23.  Because liability became reasonably clear only after Bohn accepted defendant's offer of judgment in September, 2008, and Vermont Mutual was not obligated to make an offer of settlement before then, conditioning that offer of judgment on a release of M.G.L.c. 176D claims against it did not violate M.G.L.c. 176D § 3(9)(m). See Scott, 2011 WL 4436984, at *13 (settlement offer conditioned on release did not violate 176D where liability not reasonably clear).

### D.   Prohibition against "Low Balling"

24.   M.G.L.c. 176D, § 3(9)(g) prohibits insurers from compelling insureds to institute litigation by offering substantially less than the amounts ultimately recovered.

25.   That provision reflects the Legislature's intent to penalize "low balling" an insured "where liability is either clear or highly likely." R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 754 N.E.2d 668, 678 (Mass. 2001).

26.   When making a settlement offer in response to a demand, an insurer's initial offer may be at the low end of its expected range for settlement values; it is not obligated to make its final offer, first off. See Bobick II, 790 N.E.2d at 658.

27.   Vermont Mutual's offer of settlement in October 2006 in the amount of $25,000, plus $5,000 in medical payment coverage, did not compel plaintiff to litigation, in violation of M.G.L.c. 176D, § 3(9)(g), because liability was not then clear or highly likely, nor was the amount offered outside the range of possible settlement values at that time, as evidenced by the fact that it was not out of the realm of the $61,000 offer of judgment accepted by plaintiff two years later.

### E.   Denial of Claim based upon Reasonable Investigation

28.   M.G.L.c. 176D, § 3(9)(d) prohibits an insurer from refusing to pay claims without conducting a "reasonable investigation based upon all available information."

-21-

29.  Among other possible ways, an insurer violates that provision by purposefully and strategically failing to pursue a line of inquiry because it would uncover unfavorable evidence. See Scott, 2011 WL 4436984, at *13 (citing Martinez-Rivera v. Commerce Ins. Co., 2011 WL 3276684, at *8 (Mass. Super. Ct. Apr. 11, 2011)).

30.  Vermont Mutual's investigator, Paul Rench, undertook reasonable steps to investigate Bohn's claim, including requesting and obtaining photographs of the scene on the day following the accident, obtaining weather reports, police reports and photographs, and taking statements of witnesses once he located them or was granted permission to interview them.

31.  Rench did not strategically or unreasonably fail to take photographs of the scene of the accident when he was assigned the case on February 14, 2006 because the icy conditions existing on January 11, 2006 would have changed by that time and Rench was unable to determine the exact location of Bohn's fall until at least May, 2006.

32.  To the contrary, Gillespie initially instructed Rench to conduct a "full investigation" and, considering Rench's extensive experience as a claims investigator and his experience investigating claims for Vermont Mutual, there is no evidence to suggest that Vermont Mutual advised him to avoid pursuing any inquiries.

33.  Vermont Mutual also obtained legal advice from Attorney Callan as part of its investigation of Bohn's claim and reasonably relied upon that information when denying his claim.

34.  Accordingly, Vermont Mutual did not refuse to pay Bohn's demand in October, 2006 without conducting a reasonable investigation.

**F.   Other Alleged Violations of Chapter 176D**

35.  There is no evidence to support plaintiff's allegations that defendant violated four other enumerated prohibitions contained within M.G.L.c. 176D, § 3(9), specifically § 3(9)(a), (b), (l) or (n).

36.  Vermont Mutual did not misrepresent pertinent facts or insurance policy provisions relating to coverage, in violation of M.G.L.c. 176D, § 3(9)(a), because Rench accurately informed plaintiff, by letter dated May 4, 2006, that the Giardinas' policy on the Railroad Street Property afforded $500,000 in liability coverage and $5,000 in "Medical Payments," and plaintiff in fact demanded the extent of that coverage in his September 19, 2006 letter.

37.  There is no evidence to suggest that Vermont Mutual failed to acknowledge or act reasonably promptly upon communications with respect to claims arising under its insurance policy, in violation of M.G.L.c. 176D, § 3(9)(b).

38.  Throughout his investigation of the claim Rench

-23-

responded promptly to communications sent by plaintiff leading up to plaintiff's Chapter 93A demand letter on September 19, 2006.

39.   Although Gillespie erroneously stated in her October 10, 2006 letter to Attorney Weingold that Vermont Mutual had not received records of all alleged medical expenses incurred by plaintiff, her related request did not delay the investigation or payment of claims because Vermont Mutual made its first settlement offer nine days later, on October 19, 2006, within 30 days of plaintiff's 93A demand.

40.   There is no evidence to suggest that Vermont Mutual delayed the investigation or payment of claims by requiring subsequent, unnecessary "proof of loss forms," in violation of M.G.L.c. 176D, § 3(9)(l) because the October 10, 2006 letter from Gillespie, discussed supra, did not delay the investigation and did not require submission of the medical records in some other form.

41.   To the extent the investigation was delayed at all, that delay was caused at least as much by plaintiff's counsel as by Vermont Mutual which was obligated to ascertain the situs of the accident, obtain photographs and take witness statements, all of which information was within the control of but not promptly provided by said counsel.  In any event, completion of the investigation by August, 2006 was not untimely under the circumstances.

42.   Vermont Mutual did not fail to provide promptly a reasonable explanation of the basis for denying plaintiff's claim or for its offer of a compromise settlement, in violation of M.G.L.c. 176D, § 3(9)(n), because, in its October 19, 2006 response to plaintiff's Chapter 93A demand letter, Vermont Mutual explained why it believed liability was not yet reasonably clear, i.e. its questions with respect to a "natural" accumulation of snow and ice, trespass, plaintiff's contributory negligence and the comparative negligence of Ragauskaite.

43.   With respect to defendant's alleged violation of M.G.L.c. 93A for failing to adhere to its own non-binding internal claims handling guidelines or for otherwise "improperly" documenting plaintiff's claim, plaintiff has proffered no evidence to suggest that such allegedly improper procedures caused him any damages.  That claim is therefore unavailing.

**ORDER**

Pursuant to the foregoing Memorandum of Decision, defendant Vermont Mutual is found not to have violated the provisions of M.G.L.c. 176D, § 3 or M.G.L.c. 93A, § 2 in the process of settling the claim of plaintiff Donald Bohn against defendant's insured.  Accordingly, judgment will enter for defendant, Vermont Mutual Insurance Company, on Count I of plaintiff's complaint.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated: January 22, 2013